ACCEPTED
01-14-00857-CR
FIRST COURT OF APPEALS
HOUSTON, TEXAS
3/11/2015 10:41:07 PM
CHRISTOPHER PRINI
CLERK

# No. 01-14-00857-CR

FILED IN
1st COURT OF APPEALS
HOUSTON, TEXAS
3/11/2015 10:41:07 PM
CHRISTOPHER A. PRINE
Clerk

IN THE COURT OF APPEALS
FOR THE FIRST DISTRICT OF TEXAS

## Jesse Dimas Alvarado, *appellant*

## v.

## State of Texas, *appellee*

On Appeal from the 185th District Court
Harris County, Texas

Tr. Ct. No. 1410607

# APPELLANT'S BRIEF

Timothy A. Hootman
SBN 09965450
2402 Pease St
Houston, TX 77003
713.247.9548
713.583.9523 (f)
Email: thootman2000@yahoo.com

ATTORNEY FOR APPELLANT, JESSE
DIMAS ALVARADO

ORAL ARGUMENT REQUESTED

# LIST OF PARTIES AND COUNSEL

The following persons and entities are parties or counsel in this case:

| | |
|---|---|
| **Appellant:** | Jesse Dimas Alvarado |
| **Counsel for appellant in trial court:** | Brian D. Coyne, SBN 04966800<br>1914 Memorial Dr.<br>Houston, TX 77007<br>713.863.8700 |
| **Counsel for appellant on appeal:** | Timothy A. Hootman, SBN 09965450<br>2402 Pease St<br>Houston, TX 77003<br>713.247.9548<br>713.583.9523 (f)<br>Email: thootman2000@yahoo.com |
| **Appellee:** | State of Texas |
| **Counsel for appellant in trial court:** | Neil Krugh, SBN 24068262<br>Sarah Bruchmiller, SBN 24051359<br>Harris County District Attorney's Office<br>1201 Franklin<br>Houston, TX 77002<br>713.755.5800 |

# TABLE OF CONTENTS

LIST OF PARTIES AND COUNSEL ................................................................. 2

TABLE OF CONTENTS ............................................................................ 3

INDEX OF AUTHORITIES ......................................................................... 5

STATEMENT OF CASE ............................................................................. 9

ISSUES PRESENTED ............................................................................. 10

STATEMENT OF FACTS .......................................................................... 11

    a. The felony conviction underlying appellant's felon-in-possession-of-a-firearm conviction.............................................11

    b. The pistol, where it was located in the home, and appellant's connection to it.......................................................12

    c. The irrelevant and prejudicial evidence of appellant's bad character in general. ....................................................... 20

SUMMARY OF ARGUMENT ....................................................................... 20

ARGUMENT AND AUTHORITIES ................................................................. 24

    Part One – Insufficient Evidence. .................................................. 24

    a. Introduction. .......................................................................... 24

    b. Applicable standards of review. ............................................. 26

    c. State constitutional law arguments first, then federal. .............................................................................. 27

    d. The history of Texas appellate courts in finding heightened individual-rights protection under the provisions of the Texas Constitution..................................................................... 28

    e. The methodology to be applied in construing the Texas Constitution. ...........................................................31

f. **Article I, section 23 of the Texas Constitution provides much more protection than the Second Amendment regarding an individual's right to keep and bear arms for self-protection in one's home.** ................................................... 33

g. **Under the particular circumstances of this case there is insufficient evidence to support appellant's conviction for possession by a felon of a firearm.** ................................................... 37

**Part Two – Ineffective Assistance of Counsel.** ........................... 44

PRAYER .......................................................................................... 49

CERTIFICATE OF WORD COUNT ............................................................. 50

CERTIFICATE OF SERVICE ....................................................................... 51

# INDEX OF AUTHORITIES

***Cases:***

*Abnor v. State*, 871 S.W.2d 726 (Tex. Crim. App. 1994)....................................44

*Anaya v. State*, 988 S.W.2d 823 (Tex. App.—Amarillo 1999, no pet.) ...............46

*Autran v. State*, 887 S.W.2d 31 (Tex. Crim. App. 1994) .......................29, 31, 32

*Bauder v. State*, 921 S.W.2d 696 (Tex. Crim. App. 1996) .................................29

*Bell v. State*, 90 S.W.3d 301 (Tex. Crim. App. 2002)........................................27

*Bentley v. Bunton*, 94 S.W.3d 561 (Tex. 2002) ................................................27

*Boyington v. State*, 738 S.W.2d 704 (Tex. App.—Houston [1ˢᵗ Dist.] 1985, no pet. ) ...................................................................................46

*Brown v. State*, 974 S.W.2d 289 (Tex. App.—San Antonio 1998, pet. ref'd) ...................................................................................................46

*Channel 4, KGBT v. Briggs*, 759 S.W.2d 939 (Tex. 1988) ................................37

*Collins v. State*, 901 S.W.2d 503 (Tex. App.—Waco 1994, no pet.) ...................39

*Cude v. State*, 588 S.W.2d 895 (Tex. Crim. App. 1979) ....................................45

*Davenport v. Garcia*, 834 S.W.2d 4 (Tex. 1992) ........................................ 27, 30

*Edgewood Indep. Sch. Dist. v. Kirby*, 777 S.W.2d 391 (Tex. 1989)....................30

*Ex parte Menchaca*, 854 S.W.2d 128 (Tex. Crim. App. 1993) ..................... 45, 48

*Ex parte Tucci*, 859 S.W.2d 1 (Tex. 1993)............................................... 27, 30

*Glivens v. State*, 918 S.W.2d 30 (Tex. App.—Houston [1ˢᵗ Dist.] 1996, pet. ref'd)..................................................................................... 46

*Goodspeed v. State*, 187 S.W.3d 390 (Tex. Crim. App. 2005) .......................... 45

*Gosch v. State*, 829 S.W.2d 775 (Tex. Crim. App. 1991)...................................48

*Harris County Bail Bond Bd. v. Pruett*, 177 S.W.3d 260 (Tex. App.—Houston [1ˢᵗ Dist.] 2005, no pet. ) .......................................................28

*Harris Cnty. Hosp. Dist. v. Tomball Reg'l Hosp.*, 283 S.W.3d 838 (Tex. 2009)................................................................................. 26, 27, 32

*Hawkins v. State*, 89 S.W.3d 674 (Tex. App.—Houston [1ˢᵗ Dist.] 2002, pet. ref'd) ......................................................................... 37, 38, 40

*Heitman v. State*, 815 S.W.2d 681 (Tex. Crim. App. 1991)....................30, 31, 33

*Hernandez v. State*, 726 S.W.2d 53 (Tex. Crim. App. 1986) ............................. 47

*HL Farm Corp. v. Self*, 877 S.W.2d 288 (Tex. 1994) ......................................... 27

*Hyett v. State*, 58 S.W.3d 826 (Tex. App.—Houston [14th Dist.] 2001, pet. ref'd) ...................................................................... 38

*In re J.W.T.*, 872 S.W.2d 189 (Tex. 1994) ...................................................... 30

*James v. State*, 264 S.W.3d 215 (Tex. App.—Houston [1st Dist.] 2008, pet. ref'd) .............................................................. 37, 38, 40

*Johnston v. State*, 145 S.W.3d 215 (Tex. Crim. App. 2004) .............................. 44

*Lasalle Bank Nat'l Ass'n v. White*, 246 S.W.3d 616 (Tex. 2007) ........................ 31

*Lecroy v. Hanlon*, 713 S.W.2d 335 (Tex. 1986) ............................................... 30

*Mitchell v. State*, 931 S.W.2d 950 (Tex. Crim. App. 1996) ............................... 44

*Mata v. State*, 226 S.W.3d 425 (Tex. Crim. App. 2007) ................................... 45

*Miles v. State*, 644 S.W.2d 23 (Tex. App.—El Paso 1982, no pet.) ............... 45, 46

*Montez v. State*, 824 S.W.2d 308 (Tex. App.—San Antonio 1992, no pet. ) ................................................................................... 46

*Montgomery v. State*, 810 S.W.2d 372 (Tex. Crim. App. 1991) ........................ 44

*O'Quinn v. State Bar of Texas*, 763 S.W.2d 397 (Tex. 1988) ............................. 30

*Parrish v. State*, 889 S.W.2d 658 (Tex. App.—Houston [14th Dist.] 1994, pet. ref'd) ............................................................... 31, 32

*Perrero v. State*, 990 S.W.2d 896 (Tex. App.—El Paso 1999, pet. ref'd) ...................................................................................... 45

*Proctor v. Andrews*, 972 S.W.2d 729 (Tex. 1998) ........................................... 27

*R. Communications, Inc. v. Sharp*, 875 S.W.2d 314 (Tex. 1994) ...................... 27

*Ramirez v. State*, 873 S.W.2d 757 (Tex. App.—El Paso 1994, pet. ref'd) ...................................................................................... 46

*Rankin v. State*, 974 S.W.2d 707 (Tex. Crim. App. 1996) ................................ 44

*Republican Party of Tex. v. Dietz*, 940 S.W.2d 86 (Tex. 1997) ......................... 31

*Rhoades v. State*, 934 S.W.2d 113 (Tex. Crim. App. 1996) .............................. 28

*Richardson v. State*, 865 S.W.2d 944 (Tex. Crim. App. 1993) .......................... 30

*Robbins v. State*, 88 S.W.3d 256 (Tex. Crim. App. 2002) ................................ 44

*Roberts v. State*, 187 S.W.3d 475 (Tex. Crim. App. 2006) ................................. 45

*Ross v. State*, 133 S.W.3d 618 (Tex. Crim. App. 2004) ...................................... 26

*State v. Duke*, 42 Tex. 455 (1875) ...................................................................... 35

*Stone v. State*, 17 S.W.3d 348 (Tex. App.—Corpus Christi 2000, pet. ref'd) ................................................................................................... 45

*Stringer v. Cendant Mortgage Corp.*, 23 S.W.3d 353 (Tex. 2000) ................... 31

*Thomas v. State*, 923 S.W.2d 611 (Tex. App.—Houston [1st Dist.] 1995, no pet.) ) ........................................................................... 46

*Thompson v. State*, 9 S.W.3d 808 (Tex. Crim. App. 1999) ............................... 47

*Vasquez v. State*, 830 S.W.2d 948 (Tex. Crim. App. 1992) ............................... 45

*Vaughn v. State*, 931 S.W.2d 564 (Tex. Crim. App. 1996)................................. 48

*White v. State*, 890 S.W.2d 131 (Tex. App.—Texarkana 1994, pet. ref'd) ................................................................................................... 39

**Federal cases:**

*Burks v. United States*, 437 U.S. 1 (1978) ........................................................ 26

*Crockett v. McCotter*, 796 F.2d 787 (5th Cir. 1986)............................................ 48

*District of Columbia v. Heller*, 554 U.S. 570 (2008) ......................................... 36

*Florida v. Wells*, 495 U.S. 1 (1990) ................................................................... 30

*Gilow v. New York*, 268 U.S. 652 (1925) ............................................................ 33

*Green v. Massey*, 437 U.S. 19 (1978)................................................................. 26

*Jackson v. Virginia,* 443 U.S. 307 (1979) .......................................................... 26

*Lyons v. McCotter*, 770 F.2d 529 (5th Cir. 1985) ............................................... 46

*McDonald v. City of Chicago*, 130 S. Ct. 3020, 561 U.S. – (2010) .................... 34

*Moore v. Madigan*, 702 F.3d 933 (7th Cir. 2012) .............................................. 36

*Sawyer v. Smith*, 497 U.S. 227 (1990) ............................................................... 29

*Smith v. Maryland*, 442 U.S. 735 (1979) ........................................................... 30

*Spriggs v. Collins*, 993 F.2d 85 (5th Cir. 1993) ................................................. 46

*Strickland v. Washington,* 466 U.S. 668 (1984) ......................................... 46, 47

**Out of state cases:**

*Britt v. State*, 681 S.E.2d 320 (N.C. 2009) ...................................................... 37

**Statute, codes and constitutional provisions:**

TEX. CONST. art. I, § 23................................................................*passim*

TEX. GOV'T CODE § 311.021(1) ...................................................................... 27

TEX. PEN. CODE § 6.01(b)................................................................................ 37

TEX. PEN. CODE § 46.04(a)(1) ..............................................................*passim*

TEX. R. EVID. 403) ......................................................................................... 44

TEX. R. EVID. 404(b) ...................................................................................... 44

U.S. CONST. amend. 2.............................................................................*passim*

**Secondary sources:**

Catherine Greene Burnett and Neil Colman McCabe, *A Compass in the Swamp: A Guide to Tactics in State Constitutional Law Challenges*, 25 TEX. TECH L. REV. 75 (1993) ........................................... 33

Charles Alan Wright, 8 THE LAW OF FEDERAL COURTS (5th ed. 1994)................. 29

Chemerinsky, CONSTITUTIONAL LAW, Third Ed. (2006) .................................... 34

Justice Joseph Story, III COMMENTARIES ON THE CONSTITUTION OF THE UNITED STATES (Boston: Hilliard, Gray, and Company, 1833) ...................................................................................................... 33

Stephen P. Halbrook, *The Right to Bear Arms in Texas: The Intent of the Framers of the Bills of Rights*, 41 Baylor L. Rev. 629 (1989) ....................................................................................................... 36

# STATEMENT OF THE CASE

Appellant was charged by indictment with unlawful possession of a firearm in violation of section 46.04(a)(1) of the Penal Code (CR 9). After a plea of not guilty, a jury convicted appellant (CR 33-39) and the trial court sentenced him to five years in prison and $335.00 in court costs (CR 40).

This appeal follows.

# ISSUES PRESENTED

***Issue One:*** Is there legally sufficient evidence to sustain appellant's conviction?

***Issue Two:*** Was appellant denied effective assistance of counsel by his trial lawyer's failure to object to extraneous bad-acts, character conformity evidence?

# STATEMENT OF FACTS

The facts developed at trial, viewed in the light most favorable to the verdict, are as follows.

### a.     The felony conviction underlying appellant's felon-in-possession-of-a-firearm conviction.

On July 21, 2003, appellant pleaded guilty to sexual assault of a teenaged female who was between 14 and 17 years old (her exact age is not clear from the record) while he was 18 years old. (RR 3/58 and 5/State Exh. 9). More specifically, appellant pleaded guilty to the second paragraph of the indictment which alleges that he "cause[d] the penetration of the female sexual organ of … the [c]omplainant, a person younger than seventeen years of age … by placing his finger in the female sexual organ of the [c]omplainant." *Id.* Appellant was sentenced to ten years deferred adjudication probation with "152 days in the Harris County Jail beginning July 21, 2003" as a condition of the probation. (RR 5/State Exh. 9).

On July 22, 2003 (the day after being sentenced in the sexual assault case), a motion to adjudicate appellant's deferred adjudication probation was filed because he "committed the offense of intentionally and knowingly escaping from custody on or about July 21, 2003." *Id.* The motion to adjudicate states that the confinement from which appellant escaped "was the result of conditions imposing a period of confinement in a secure

11

correctional facility." *Id.* In other words, appellant escaped the same day that he was sentenced to the deferred adjudication probation regarding the sexual assault case.

On August 12, 2003, appellant pleaded true to the motion to adjudicate without an agreed recommendation on the sentence, was adjudged guilty and sentenced to eight years in prison, a $500.00 fine and $823.00 in court costs. *Id.* Thus, appellant would have completed his sentence on August 12, 2011. (RR 3/26).

### b. The pistol, where it was located in the home, and appellant's connection to it.

On December 5, 2013 (less than five years after appellant completed his sentence on the sexual assault case), a federal child-pornography search warrant was executed on a residence located at 137 Soren Lane, Houston, Texas by a team of federal and state police officers. (RR 3/15). The residence is a small two-bedroom, wood-framed house where the Alvarado family lived for many years. (RR 3/16-18 and 5/State Exh. 1, 2 & 3). One of the officers considered the home to be located in one of the highest crime areas in Houston. (RR 3/27-28). In this regard, appellant's brother, Alfred, testified that when he was small the home was "shot up" by strangers in a drive-by shooting incident. (RR 3/87). And, appellant's mother testified that two and a half years earlier a car drove by and threw rocks thru the window of the bedroom where the pistol in question was

12

located.  (RR 4/19).  This is the same window where the police found a surveillance camera pointed at the street.  (RR 3/87 and 5/State Exh. 12).

The purpose of the search warrant was not directly told to the jury (although it was strongly insinuated), but in a pretrial hearing it was shown that the purpose was to look for child pornography believed to be in the home.  (RR 3/6).  When the warrant was being served the officers did not know who in particular might be in possession of the child pornography suspected of being in the home, but Officer Krugh testified that "[a]s it turned out, the target of my investigation was Alfred Alvarado", appellant's brother.  (RR 3/20).

When the officers arrived at the home, appellant, his brother, Alfred, his mother and a "young female" were inside.  (RR 3/19).  Appellant's other brother, Rudy, was not present but his car was parked in the front yard.  (RR 3/28-29).  A search of the vehicle revealed a "fairly good amount of drugs."  (RR 3/28).  Rudy was later arrested and sent to prison for the drugs in his car.  *Id.*  A series of questions and answers through Officer Ackley's testimony showed Rudy's history of criminal involvement:

> Q:   Okay.  And you, I'm sure, in your investigation, or in a subsequent investigation, learned that that vehicle was owned by Rudy Alvarado, didn't you?
>
> A:   The white one?  Yes, sir.
>
> Q:   Okay.  And was he on the scene?
>
> A:   No, sir, he was not.
>
> Q:   And what did you find out about him, if you can remember?

A: He had an extensive criminal history in regards to drugs. According to our records from the sheriff's office, he was a member of the Houston gang and that was most of the current – most of the current information that we had on Rudy.

Q: And his record included a long string of convictions for drugs and guns, right?

A: That's correct.

Q: In fact, he was known as a habitual criminal, wasn't he?

A: I would categorize him as one, yes.

Q: I mean, the state law says if you got two penitentiary trips and you get a third one, you can become a three-strikes-and-you're-out guy, right?

A: Yes, sir.

Q: And I assume that there was further investigation into Rudy's possession of drugs in his vehicle?

A: I don't quite understand what you mean, "further"?

Q: He was arrested, wasn't he?

A: Yes, sir, I believe he was. (RR 3/28-30).

A pistol was found on the upper shelf of the closet inside one of the bedrooms where appellant was sleeping when the officers arrived. (RR 3/22-23 & 60). Officer Nieto testified that appellant said the room was his. (RR 3/46, 60, 62). Also, located in the room were a wallet that contained appellant's (1) Texas identification card issued on August 3, 2012 and expiring on September 21, 2012 with the 137 Soren Lane address, (2) Texas identification card issued on September 18, 2012 and expiring on September 21, 2013 with the 137 Soren Lane address, and (3) Texas offender card with no address listed. (RR 3/47 and 5/State Exh. 6-10). However, appellant's brother, Alfred, clarified through his testimony that

14

he had purchased the pistol for self-protection and placed it in the closet, and that the bedroom was his until May 0f 2013. (RR 3/87-91). Alfred's testimony in this regard is as follows:

Q: And the area you live in is a high-crime area?

A: Well, it has been recently and in the past, you know, we've had – you know, our house shot up when I was smaller, so, I mean, yeah, it has been, you know, pretty bad.

Q: Did you ever purchase a gun?

A: Actually, yes. I would say actually a couple guns – it just hasn't been one – in the past.

Q: Why did you buy a gun?

A: Protection. In my neighborhood, you have to be very well protected and it was only me and my mom for a long time. So, you know, it was just for protection.

\* \* \*

Q: (Referring to State's Exhibit 20) Is this the gun you bought? I know you don't know serial numbers, but does that look like the gun you bought?

A: Looks like one of them I remember buying.

\* \* \*

Q: What did you do with the gun after you bought it?

A: I ended up placing it in my closet in between some Christmas ornaments. That was it. Just in my closet.

Q: You say in your closet.

A: Yes. My closet.

Q: To your bedroom?

A: Correct.

Q: Is that the bedroom that Jesse was living in on the day they came into the house with the search warrant?

A: Yes, that's correct. That was my room.

Q: For how long?

15

A:  Since we moved there. I don't know what year exactly we moved there but I was probably, like, in seventh grade, so that was a long time.

Q:  But you used it for some years?

A:  Yeah, a lot. That was my room.

Q:  When did you move out of that room?

A:  After what happened to me in April, when I got released. I believe I got released a couple days before May or in May. I'm – I don't recall the exact date but after my release from the hospital.

Q:  So you changed rooms.

A:  I had to change rooms.

Q:  Why is that?

A:  Because in my room, I had carpet and I had a hard time walking at that time without any assistance, so I had to use one of those old metal walkers or – aluminum walkers and since I'm a heavy-set guy, those walkers didn't feel comfortable, so I would constantly fall and bust my lip, which I still have the scars to prove, you know, that I kept on falling.

Q:  All right.

A:  So, that's why.

Q:  And you left your gun in your old room closet?

A:  Honestly I had even forgot it was in there, to be honest. It's just, like I said, I was going through so much at that time, you know, with what happened and going back and forth and doing my own rehab because I didn't have assistance at that time, so it was hard. So, a lot of things just – I forget, so I forgot, you know.

Q:  Do you have assistance now?

A:  No. Actually I am disabled now. But I've tried to get physical therapies, speech therapy, which you will notice in a little bit, I will start to lose my voice.

* * *

Q:  I'm going to show you State's Exhibit 17. It's a photograph of a closet. Do you recognize that closet?

A:   Yeah, that's my old closet to the room.  (RR Vol 3/87-90).

The state offered into evidence various photographs that misleadingly suggest the physical state of the bedroom and the exact location and visibility of the pistol at the moment the officers entered the home.  (RR 5/State Exh. 5-25).  However, it is clear from the officers' testimony that the photographs of the bedroom and pistol were taken *after* the officers had searched the bedroom and closet and therefore do not accurately show how the items were originally discovered.  (RR 3/45, 65, 68 and 5/State Exh. 5-25).  Moreover, appellant's mother testified that the photographs do not show how the bedroom and closet were kept before the officers entered.  (RR 4/16-17).  In this regard, Officer Nieto explained that State's Exhibit 17 is a picture of where in the bedroom closet in which the pistol was located, except that the photograph was taken *after* the officers had searched the room and moved the items.  (RR  3/51).

Two officers testified as to the location and accessibility of the pistol inside the bedroom.  That testimony is as follows:

**Officer Russell Ackley**

Q:   Did you happen to see where the gun was located in this room?

A:   Yes, sir.

Q:   And where was that?

A:   It was in the closet of the bedroom up in a upper shelf area.

Q:   You weren't the first officer that was in that room, though, is that right?

17

A: That's correct. (RR 3/26-27).

* * *

Q: When you first saw the gun that's the subject of this case, where was it?

A: I believe it was in the back right bedroom in the closet.

Q: And where in the closet was it located?

A: It was in an up [sic] shelf, upper shelf area.

Q: Was it on a shelf?

A: Yeah, it was kind of – it was – there's a shelf area with some other stuff up in the shelf and it was basically stuffed in between two bags or I believe it was basically stuffed in between two bags or I believe it was bags and some other various items that were upper shelf area.

Q: It was stuffed between two bags?

A: Yes.

Q: What type of bags were they?

A: Oh, probably – I want to say they were some sort of, like, a paper-type shopping bag, something like that. That's what I can remember.

Q: So it was, like, the two bags on either side of the gun?

A: Yes, sir.

Q: And then the gun was what? Shoved up between the bags?

A: Yeah, shoved – you could see the – what I could see was the black part and it basically was the barrel pointing not towards us but away, further inside the closet.

Q: Okay. I didn't understand what you said. You saw –

A: A black piece, what I thought was, you know, a black piece and then I was told by the two officers this is where a gun was and then they showed me where it was and it was facing – it was a black-handled gun and facing not towards – not where the barrel was facing towards me as I was looking at it but it was – the barrel was faced away, further in, deeper towards the closet.

Q: How deep was it?

18

A: I mean, far enough out where I could tell that it was a gun. I couldn't tell make or model or anything like that.

Q: Was it in a holster?

A: I believe it was. (RR 3/32-34).

**Officer David Nieto**

Q: What do we see here on State's Exhibit 17?

A: That's a picture of the top portion of the closet and over on the left, on top of the shelf, you can see a little black object. That's actually the pistol. It was – you know, it was put, like, on top like that with the butt of the gun facing outward. It was actually in, like, a cloth, nylon-type holder or holster. (3/51).

* * *

Q: How visible was the weapon inside of the closet?

A: Well, you glance up there, if you were standing there, you look up, you're going to see it. You'll see the – you know, the back end of the gun, the handle, the butt. It wasn't covered or obstructed by anything. (R 3/60).

* * *

Q: It was found in the closet when you first entered the room?

A: Absolutely. The gun never left the room until I put it in the bag and took it out of the house. It's –

Q: And if you were to open up the closet door, how visible would it be to the naked eye?

A: If you would have looked up, you would have seen it right – the butt of the gun right there.

Q: So, all you would have to do would be look up and you could see the gun?

A: Yes, the butt of the gun, you know, because of the way it was facing. I'm not tall enough to see the top. I guess if you were tall enough, you might have seen the whole gun, but I would have just saw the butt of the gun.

Q: So anyone could open the door, look up and see the gun?

A: That's correct.

19

Q:   What if you're trying to get cloths out of the closet?

A:   (No response.)

Q:   What if you're trying to take a hanger off of the shelf?

A:   If you were to look up, you would have seen it.  (RR 3/73-74).

### c.   The irrelevant and prejudicial evidence of appellant's bad character in general.

Throughout the trial a series of irrelevant and prejudicial evidence, which was introduced into evidence without objection from defense counsel, permeated the trial establishing appellant to be a bad person in general even though the veracity of this information was not subjected to scrutiny.  Specifically, the state introduced without objection police and prison records indicating that the teenaged female, with whom appellant had been convicted of having sexual contact with his hand, had been forcefully raped and sodomized by appellant after he entered her bedroom window at night, that he ejaculated in her mouth without her consent, that he verbally and physically abused her, including telling her that he had AIDS and other nefarious diseases that she may have contracted, and that he had threatened to hurt her and her father.  (RR 5/State Exh. 4).  This hearsay evidence was not objected to by defense counsel and is not what appellant was actually found guilty of in the underlying felony conviction—in fact, appellant was not even charged with forcible rape.  The indictment in the underlying case was introduced into evidence which alleges two counts, the count for which he was found guilty (placing his finger inside

20

the vagina), *and* the count that was dismissed (placing his penis inside the vagina). (RR 5/State Exh. 4). Evidence that appellant had committed the offense of escape was admitted. (RR 5/State Exh. 4 & 27).

Also, introduced into evidence—again, without objection—were various notations by prison officials noting that appellant had misbehaved while in prison by "mast[urbating] in public and refus[ing] to stop when ordered to do so", and, that he is a registered sex offender. (RR 5/State Exh. 4). Additional prison-record notations were admitted showing that appellant had been arrested seven times, had been arrested for running from court after being sentenced to jail time, had been convicted of escape, had been convicted of evading arrest, that he had served 30 days in jail as a minor in possession of cigarettes, and that he has used marijuana, Codeine, Ecstasy, Cocaine, Xanax, embalming fluid, and is an excessive drinker. (RR 5/State Exh. 9).

* * *

The jury was instructed in relevant part as follows:

> [A] person who has been convicted of a felony commits the offense of unlawful possession of a firearm by a felon if he intentionally or knowingly possesses a firearm after conviction and before the fifth anniversary of the person's release from confinement following conviction of the felony.
>
> "Possession" means actual care, custody, control, or management.
>
> A person commits an offense only if he voluntarily engages in conduct, including an act or possession.

21

>Possession is a voluntary act if the possessor knowingly obtains or receives the thing possessed or is aware of his control of the thing for a sufficient time to permit him to terminate his control. (CR 33).

The jury found appellant guilty, and the trial court assessed his sentence at five years in prison and $335.00 in court costs. This appeal follows.

# SUMMARY OF ARGUMENT

There is legally insufficient evidence to support the conviction of appellant for felon in possession of a firearm because the evidence does not affirmatively link the pistol in question to appellant—it was not in plain view, appellant made no incriminating statements, he did not attempt to flee, and he made no furtive gestures or indications of consciousness of guilt. Therefore this Court should enter a judgment of acquittal.

Appellant was provided ineffective assistance of counsel when the state offered into evidence prison records containing bad-acts that, according to the records, appellant had engaged in over time and his trial counsel did not object even, though the records had no relevance to any issues to be decided by the jury. This claim can be raised by direct appeal because there is no imaginable trial strategy that could justify trial counsel not objecting to the evidence. Therefore this Court should reverse and remand for a new trial.

23

# ARGUMENT AND AUTHORITIES

This brief is divided into two Parts. Part One argues that there is legally insufficient evidence to support the jury verdict. If this is true, appellant is entitled to an acquittal on appeal. Part Two argues that appellant's trial counsel was ineffective and that the ineffectiveness is so obvious that it can be raised by direct appeal instead of by habeas corpus review. If this is true, appellant is entitled to a new trial.

\* \* \*

## Part One – Insufficient Evidence

### a. Introduction.

Appellant was indicted and found guilty by a jury of unlawful possession of a firearm in violation of section 46.04(a)(1) of the Penal Code, which provides:

> A person who has been convicted of a felony commits an offense if he possesses a firearm ... after conviction and before the fifth anniversary of the person's release from confinement following conviction of the felony or the person's release from supervision under community supervision, parole, or mandatory supervision whichever date is later[.]
>
> TEX. PEN. CODE § 46.04(a)(1).

However, individuals have a fundamental right to keep and bear arms under the state and federal constitutions, which provide:

**Texas Constitution:**

***Right to keep and bear arms.*** Every citizen shall have the right to keep and bear arms in the lawful defense of himself or the State; but the legislature shall have power, by law, to regulate the wearing of arms, with a view to prevent crime.

TEX. CONST. art. I, § 23.

\* \* \*

**United States Constitution:**

A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed.

U.S. CONST. amend. 2.

Thus, this appeal turns on an analysis of the sufficiency of the evidence supporting the jury's conclusion that appellant violated section 46.04(a)(1) of the Penal Code vis-à-vis the state and federal constitutional rights to keep and bear arms. No Texas appellate court has held that a person previously convicted of a felony has (or not) a constitutional right to keep and bear arms in his home for self-defense purposes. Appellant argues herein that (1) under the narrow circumstances of this case, he did not lose his right to keep and bear arms when convicted of the sexual assault offense, and (2) when section 46.04(a)(1) is harmonized with the state and federal constitutional rights to keep and bear arms, there is insufficient evidence to support his conviction, and thus he should be acquitted.

25

### b.    Applicable standards of review.

#### i.    *The legal sufficiency of the evidence standard.*

Because appellant argues that there is insufficient evidence to support his conviction, the *Jackson v. Virginia* legal sufficiency standard of review applies.  443 U.S. 307, 315-16 (1979); *see also Ross v. State*, 133 S.W.3d 618, 620 (Tex. Crim. App. 2004).  Under that standard of review, evidence is not legally sufficient if, when viewing the evidence in a light most favorable to the verdict, no rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt.  *See Jackson*, 443 U.S. at 319 ("[T]he relevant question is whether, after reviewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt[.]").  A defendant's remedy when he has been convicted with legally insufficient evidence is an acquittal.  *Burks v. United States*, 437 U.S. 1, 17-18 (1978); *Green v. Massey*, 437 U.S. 19, 24 (1978).

#### ii.    *The* de novo *standard of review regarding interpretation of statutes and constitutional provisions.*

Because application of the sufficiency of evidence standard in this case also requires the Court to construe section 46.04(a)(1) of the Penal Code and the state and federal rights to keep and bear arms provisions, the *de novo* standard of review applies when the Court is construing the Penal Code and the constitutional provisions.  *Harris Cnty. Hosp. Dist. v.*

26

*Tomball Reg'l Hosp.*, 283 S.W.3d 838, 842 (Tex. 2009).

### iii. The constitutional-harmony canon of statutory construction.

In determining whether there is sufficient evidence to sustain a criminal conviction, a court is per force also construing the Penal Code provision underlying the conviction. In some cases this dual operation is more obvious than others, but it is nevertheless always occurring. Thus canons of statutory construction can come into play. Here, the relevant canon of construction is the constitutional-harmony canon because section 46.04(a)(1) should be interpreted in a way so as to avoid its infringement upon appellant's right to keep and bear a firearm under the state and federal constitutions. *See Proctor v. Andrews*, 972 S.W.2d 729, 735 (Tex. 1998), *accord* TEX. GOV'T CODE § 311.021(1) (requiring enacted laws to comply with state and federal constitutions).

### c. State constitutional law arguments first, then federal.

When an appellant argues—as here—that a state constitutional right is more expansive than a similar federal constitutional right, an appellate court should address the state constitutional argument first. *See HL Farm Corp. v. Self*, 877 S.W.2d 288, 290 (Tex. 1994); *R. Communications, Inc. v. Sharp*, 875 S.W.2d 314, 315 (Tex. 1994); *Ex parte Tucci*, 859 S.W.2d 1, 5 (Tex. 1993) (plurality opinion); *Davenport v. Garcia*, 834 S.W.2d 4, 17 (Tex. 1992). If the challenged action violates the state constitution,

consideration of any federal claim is unnecessary. *Davenport*, 834 S.W.2d at 11. In this regard, it is important to note that the lock-step approach to interpretation of the Texas Constitution (*i.e.*, that state constitutional provisions similar to federal provisions provide the same level of protection) applies only where the differences between state and federal constitutional provisions are not argued by the parties, in which case a court's analysis is limited to the federal provision under the assumption that the state provision provides the same level of protection as the federal—this is more of a judicial economy/waiver principle than an interpretive methodology. *See, e.g., Bentley v. Bunton*, 94 S.W.3d 561, 579 (Tex. 2002); *Bell v. State*, 90 S.W.3d 301, 305 (Tex. Crim. App. 2002); *Rhoades v. State*, 934 S.W.2d 113, 119 (Tex. Crim. App. 1996); *Harris County Bail Bond Bd. v. Pruett*, 177 S.W.3d 260, 271 n. 8 (Tex. App.— Houston [1st Dist.] 2005, no pet.). Thus clearly the lock-step approach should not be applied in this case.

### d. The history of Texas appellate courts in finding heightened individual-rights protection under the provisions of the Texas Constitution.

Federalism contemplates the development of state and federal government with federal court sensitivity to state prerogatives. In our federal system, while federal law is supreme, the states are sovereign in their own right, and state authority is entitled a degree of respect and autonomy. State rights are effectuated through measures such as the

28

abstention doctrines and the doctrine of comity and equitable restraint, by which federal courts avoid passing on state law issues believed to be best left to the state courts. *See* Charles Alan Wright, 8 THE LAW OF FEDERAL COURTS 49 & 52 (5th ed. 1994). Thus, in our federal system of dual sovereignty, state constitutional laws are autonomous of federal constitutional law, and, sovereign in their own rights, the states are empowered to adopt their own constitutions and to interpret them as they see fit, independent of federal constitutional law. As the United States Supreme Court has said, "State courts are coequal parts of our national judicial system and give serious attention to their responsibilities of enforcing the commands of the Constitution." *Sawyer v. Smith*, 497 U.S. 227, 241 (1990). The obvious corollary to this is that state courts *alone* have responsibility of interpreting and enforcing their constitutions which often provide for more and additional protections of individual rights and liberties then the federal constitution.

In keeping with their role within American Federalism described above, Texas courts routinely find that provisions of the Texas constitution provide for more and additional individual protections than similar federal constitutional provisions.[1] This is an expected and natural occurrence

---

[1] *See, e.g., Bauder v. State*, 921 S.W.2d 696 (Tex. Crim. App. 1996) (holding that the state constitutional due course of law provision provides greater protection than the federal Double Jeopardy Clause); *Autran v. State*, 887 S.W.2d 31 (Tex. Crim. App. 1994) (holding that under the state constitution closed containers could not be searched as part of a

given the structural arrangement of our Republican form of government. In fact, it would frustrate the entire Federalism structure and impede the orderly development of federal and state constitutional law if Texas and other states did not construe their constitutional provisions differently, at least on occasion—the unique experiences of the states are, after all, a fundamental aspect of American Democracy that act as laboratories of social and economic progress.

warrantless arrest inventory search, contrary to the holding in *Florida v. Wells*, 495 U.S. 1 (1990) that closed containers could be searched under federal constitution); *In re J.W.T.*, 872 S.W.2d 189, 197 & n. 23 (Tex. 1994) (stating the Texas due course of law guarantee has independent vitality from the due-process clause of the fourteenth amendment); *Richardson v. State*, 865 S.W.2d 944 (Tex. Crim. App. 1993) (holding that under the state constitution use of pen register may constitute a search under state constitution, contrary to the holding in *Smith v. Maryland*, 442 U.S. 735 2577 (1979) that use of a pen register is not a search under the 4th amendment); *Ex parte Tucci*, 859 S.W.2d at 5 (stating the Texas constitution provides greater rights of free expression than does the federal constitution); *Davenport*, 834 S.W.2d at 8 (recognizing some aspects of the Texas free speech provision are broader than the first amendment); *Heitman v. State*, 815 S.W.2d 681 (Tex. Crim. App. 1991); *Edgewood Indep. Sch. Dist. v. Kirby*, 777 S.W.2d 391, 397 (Tex. 1989) (holding that the state educational finance system violates the state constitution, although the United States Supreme Court had found no violation of the federal constitution); *O'Quinn v. State Bar of Texas*, 763 S.W.2d 397, 402 (Tex. 1988) (holding that the state constitutional grant of free speech is broader than the federal First Amendment); *Channel 4, KGBT v. Briggs*, 759 S.W.2d 939, 944 (Tex. 1988) (Gonzalez, J., concurring) (stating that the rights of free speech and free press are more extensive under the state constitution than under the federal constitution); *Lecroy v. Hanlon*, 713 S.W.2d 335, 338-40 (Tex. 1986) (holding that the state constitution's open-courts provision provides rights separate and distinct from traditional guarantees of due process).

### e. The methodology to be applied in construing the Texas Constitution.

When construing the Texas constitution the goal is to ascertain what the Framers intended for the words of the constitution to mean. *See Autran v. State*, 887 S.W.2d 31, 37 (Tex. Crim. App. 1994) (plurality opinion); *Parrish v. State*, 889 S.W.2d 658, 660 (Tex. App.—Houston [14th Dist.] 1994, pet. ref'd). In ascertaining the intended meaning, the **text** of the constitutional provision at issue is the beginning point. *Lasalle Bank Nat'l Ass'n v. White*, 246 S.W.3d 616, 619 (Tex. 2007) ("When interpreting the Texas Constitution, we 'rely heavily on its literal text and must give effect to its plain language.' ") (citing *Stringer v. Cendant Mortgage Corp.*, 23 S.W.3d 353, 355 (Tex. 2000) and *Republican Party of Tex. v. Dietz*, 940 S.W.2d 86, 89 (Tex. 1997)); *Autran*, 887 S.W.2d at 37; *Parrish*, 889 S.W.2d at 660. The **hierarchical placement** of the constitutional provision within the body of the whole is also important. *Heitman v. State*, 815 S.W.2d 681, 690 (Tex. Crim. App. 1991) ("[I]t is, we believe, significant that our Bill of Rights is the first article in our state constitution and that it held this position in each of Texas's five state constitutions. Such placement indicates the degree of importance of these provisions to the drafters of the constitution and the citizens of this state, as opposed to the federal Bill of Rights which was amended to the end of the federal counterpart.") (footnote omitted). After considering the text and its placement, the **legislative history**, the **evil intended to be**

31

***remedied***, and the ***goal sought to be accomplished*** by the constitutional provision should be factored into the analysis. *Harris Cnty. Hosp. Dist.*, 283 S.W.3d at 842; *Autran*, 887 S.W.2d 37; *Parrish*, 889 S.W.2d at 660. ***Comparable constitutional jurisprudence*** from other jurisdictions is relevant. *Autran*, 887 S.W.2d 37; *Parrish*, 889 S.W.2d at 660.[2]

---

[2] The hard rules of constitutional interpretation have not changed much (if any) over time, although the debate has raged. For example, in 1833, Justice Joseph Story wrote in his famous treatise:

> In construing the constitution of the United States, we are, in the first instance, to consider, what are its nature and objects, its scope and design, as apparent from the structure of the instrument, viewed as a whole, and also viewed in its component parts. Where its words are plain, clear, and determinate, they require no interpretation; and it should, therefore, be admitted, if at all, with great caution, and only from necessity, either to escape some absurd consequence, or to guard against some fatal evil. Where the words admit of two senses, each of which is conformable to common usage, that sense is to be adopted, which, without departing from the literal import of the words, best harmonizes with the nature and objects, the scope and design of the instrument. Where the words are unambiguous, but the provision may cover more or less ground according to the intention, which is yet subject to conjecture; or where it may include in its general terms more or less, than might seem dictated by the general design, as that may be gathered from other parts of the instrument, there is much more room for controversy; and the argument from inconvenience will probably have different influences upon different minds. Whenever such questions arise, they will probably be settled, each upon its own peculiar grounds; and whenever it is a question of power, it should be approached with infinite caution, and affirmed only upon the most persuasive reasons. In examining the constitution, the antecedent situation of the country, and its institutions, the existence and operations of the state governments, the powers and operations of the confederation, in short all the

**f.** **Article I, section 23 of the Texas Constitution provides much more protection than the Second Amendment regarding an individual's right to keep and bear arms for self-protection in one's home.**

Beginning with the words of article I, section 23, the text is clear and unambiguous in stating that "[e]very citizen" has the "right to keep and bear arms in the lawful defense of himself" with the only caveat that the legislature may only "regulate the wearing of arms … to prevent crime." TEX. CONST. art. I, § 23. Being place in Article I of the Texas Constitution, it is obviously hierarchically at the top, which indicates its ranking of superior importance to the Founders. *Heitman*, 815 S.W.2d at 690.

Constitutional history shines much light on the Texas Founders thoughts when selecting the particular text of article I, section 23. Most Americans forget that it was not until 1925, in *Gilow v. New York*, that any provision of the Federal Bill of Rights was applied to the states, which initiated the Incorporation Doctrine via the Due Process Clause of the

---

circumstances, which had a tendency to produce, or to obstruct its formation and ratification, deserve a careful attention. Much, also, may be gathered from contemporary history, and contemporary interpretation, to aid us in just conclusions.

Justice Joseph Story, III COMMENTARIES ON THE CONSTITUTION OF THE UNITED STATES 134, § 183 (Boston: Hilliard, Gray, and Company, 1833).

For a general discussion of the principles of interpretation of state constitutional provisions, *see* Catherine Greene Burnett and Neil Colman McCabe, *A Compass in the Swamp: A Guide to Tactics in State Constitutional Law Challenges*, 25 TEX. TECH L. REV. 75, 79-104 (1993).

Fourteenth Amendment. 268 U.S. 652 (1925). Nor was it until 2010, in *McDonald v. City of Chicago*, that the Second Amendment was made applicable to the states through "incorporation". 130 S. Ct. 3020, 561 U.S. – (2010). The point, of course, is that the Second Amendment was initially adopted to prohibit the United States Congress (not the state legislatures) from infringing on individual Second Amendment rights until 1868 when the Fourteenth Amendment was adopted which made the Incorporation Doctrine possible. Thus at the time the Federal Constitution was written, it was thought that individuals were protected from state government infringements by state constitutions, and that the Federal Bill of Rights protected individuals from federal encroachments. Chemerinsky, CONSTITUTIONAL LAW, Third Ed. (2006) at 512. The Second Amendment was ratified in 1791 and the Fourteenth Amendment was ratified in 1868, well after the adoption of article I, section 23, and therefore it is clear that the Texas Founders understood that a constitutional provision had to be included in the Texas Constitution to protect an individual's right to keep and bear arms from state official infringement. This history provides the context of why the Texas Founders used language so different from that used in the Second Amendment and demonstrates that the objects, scope and design sought to be furthered by the Texas right to keep and bear arms provision were much more far reaching than those sought to be furthered by the United States Founders when they adopted the Second Amendment.

34

With respect to the constitutional history of Texas, the right to keep and bear arms was initially guaranteed in the Constitution of the Republic of Texas in 1836. The Texas Declaration of Independence complains in this regard: "It [being the Mexican Government] has demanded us to deliver up our arms, which are essential to our defense—the rightful property of freemen—and formidable only to tyrannical governments." Since the Republic of Texas became the twenty-eighty state of the Union in 1845, all constitutions adopted by the State of Texas have contained a right-to-keep-and-bear-firearms provision. Early interpretations of the Texas right to keep and bear arms concluded that the word "arms" refers to an individual's right, and not just a soldier's:

> The arms which every person is secured the right to keep and bear (in defense of himself or the state, subject to legislative regulation), must be such arms as are commonly kept, according to the customs of the people, and are appropriate for open and manly use in self-defense, as well as such as are proper for the defense of state. If this does not include the double-barreled shot gun, the huntsman's rifle, and such pistols at least as are not adapted to being carried concealed, then the only arms which the great mass of the people of the state have, are not under constitutional protection. *State v. Duke*, 42 Tex. 455, 458-59 (1875).

This constitutional history is consonant with what the text of article I, section 23 indicates on its face; namely, that the Founders intended for a strong individual right for all Texans to keep and bear commonly kept

35

firearms (*e.g.*, pistols) for self-protection, especially in one's home.[3]

For jurisdictional comparative purposes, it is useful to note that even the Second Amendment, with its much less permissive language than article I, section 23, was intended by the Founders of the federal government to establish an individual "the right of law-abiding, responsible citizens to use arms in defense of hearth and home." *District of Columbia v. Heller*, 554 U.S. 570, 635 (2008) (holding the District of Columbia's ban on handgun possession in the home violates Second Amendment). Judge Richard Posner of the Unites States Court of Appeals for the Seventh Circuit has taken the Second Amendment one step further and held that an individual also has a right to keep and bears arms outside of the home for self-defense. *Moore v. Madigan*, 702 F.3d 933, 942 (7th Cir. 2012). Given the text of article I, section 23 and the history surrounding it, it is obvious that provision goes much further than the Second Amendment in protecting an individual's right to keep and bear a firearm for his personal protection.

Texas has never squarely address whether a felony conviction *per se* abrogates the individual right to keep and bear a firearm for *all* purposes. Clearly, circumstances such as nonviolent nature of the conviction, the type

---

[3] For an extensive and authoritative history of the Texas right to keep and bear firearms, *see* Stephen P. Halbrook, *The Right to Bear Arms in Texas: The Intent of the Framers of the Bills of Rights*, 41 Baylor L. Rev. 629-688 (1989).

of firearm at issues, it location, and who (*e.g.*, the defendant or his family members) actually owned the firearm are important to determine when and if the defendant's fundamental right has been lost. Other jurisdictions have addressed these questions and concluded that under the constitutions of those states, a defendant convicted of a felony does not necessarily lose his state constitutional right to keep and bear arms. *See, e.g., Britt v. State*, 681 S.E.2d 320 (N.C. 2009) (holding that the law prohibiting felons from possessing firearms violated the North Carolina Constitution).

**g.** **Under the particular circumstances of this case there is insufficient evidence to support appellant's conviction for possession by a felon of a firearm.**

To establish unlawful possession of a firearm by a felon under section 46.04(a)(1), the State must show that appellant was previously convicted of a felony offense and possessed a firearm after the conviction and before the fifth anniversary of his release from confinement and before the fifth anniversary of his release from confinement or from community supervision, parole, or mandatory supervision, whichever date is later. TEX. PEN. CODE § 46.04(a)(1); *James v. State*, 264 S.W.3d 215, 218 (Tex. App.—Houston [1st Dist.] 2008, pet. ref'd); *Hawkins v. State*, 89 S.W.3d 674, 677 (Tex. App.—Houston [1st Dist.] 2002, pet. ref'd). Possession is a voluntary act if the possessor knowingly obtains or receives the thing possessed or is aware of his control of the thing for a sufficient time to permit him to terminate his control. TEX. PEN. CODE § 6.01(b); *James*, 264

37

S.W.3d at 218; *Hawkins*, 89 S.W.3d at 677. Because the firearm was not found on appellant and was not in his exclusive possession, the evidence will only sustain a conviction if it affirmatively links him to the firearm. *James*, 264 S.W.3d at 218-19; *Hawkins*, 89 S.W.3d at 677. The following factors are useful in performing an affirmative links analysis:

- defendant's presence when a search warrant is executed;
- whether the contraband (*i.e.*, gun/narcotics) was in plain view;
- defendant's proximity to and the accessibility of the contraband;
- whether defendant made incriminating statements when arrested;
- whether defendant attempted to flee;
- whether defendant made furtive gestures;
- conduct of defendant indicated a consciousness of guilt, including extreme nervousness or furtive gestures;
- whether defendant owned or had the right to possess the place where the contraband was found;
- whether the place the contraband was found was enclosed;
- whether defendant attempted to conceal the contraband.

*See James*, 264 S.W.3d at 218-19; *Hawkins*, 89 S.W.3d at 677. Despite this list of factors, there is no set formula necessitating a finding of an affirmative link, but rather affirmative links are established by the totality of the circumstances. *Hyett v. State*, 58 S.W.3d 826, 830-831 (Tex. App.—Houston [14th Dist.] 2001, pet. ref'd). Where there is a failure of the State to affirmatively link appellant to the contraband the conviction must fail. *Lassaint*, 79 S.W.3d 736, 746 (Tex. App.—Corpus Christi 2002, no pet.)

38

(acquitted where the court of appeals concluded there were no affirmative links); *Collins v. State*, 901 S.W.2d 503, 506 (Tex. App.—Waco 1994, no pet.) (conviction reversed where the defendant was in a house when a search was executed on a small house; cocaine and heroin was found in one of the bedrooms; the defendant was living off and on in the house, with the electric bill in his name; needles and unidentified drug paraphernalia were found "all over" the house, and the narcotics were in plain view if one were standing inside the bedroom); *White v. State*, 890 S.W.2d 131, 139 (Tex. App.—Texarkana 1994, pet. ref'd) (insufficient evidence where the defendant lived next door to vacant lot on which there was a boat with a tackle box containing cocaine and the defendant was standing 16 feet from the boat when the police arrived and the defendant had marijuana inside his house).

The evidence, viewed in a light most favorable to the verdict, shows that the home where the pistol was found has been used as the residence of appellant's family for many years. Appellant and his brothers grew up in the home, his mother still lives there, and he and his brothers come and go, sometimes staying at length and other times staying short periods. The home is located in one of the highest crime areas in Houston and has been shot at and had rocks thrown through the window by strangers. Appellant's brother, Rudy, purchased the pistol for self-defense specifically because of the dangerous neighborhood and the attacks on the home.

39

Rudy put the pistol on the self of the closet in the bedroom where he stayed until he suffered a debilitating health condition which caused him to move to another room in the home where there was no carpet—his walker would get caught on the carpet and cause him to fall. Rudy also installed a surveillance camera in the window of the bedroom where the pistol was, which is the same window where the rocks had been thrown. Rudy placed the pistol inside a holster on the shelf inside the closet between two bags of Christmas items. There were many other items and clothing filling the closet.

When the police arrived to execute the search warrant, appellant was sleeping in the bedroom and had placed his wallet on the small table next to him. Appellant told Officer Nieto that the room was his. The door of the bedroom closet, according to Officer Nieto's testimony, was closed (RR 3/73-74) but a portion of the back of the butt of the pistol could be seen if the door were opened and someone were not looking down into the closet.

Because the pistol was not on appellant or in his exclusive possession, there must be affirmative links tying him to it. *James*, 264 S.W.3d at 218-19; *Hawkins*, 89 S.W.3d at 677. Appellant's family members that do not have felony convictions obviously have a right to keep and bear arms inside the home for self-protection. Appellant's brother, Rudy, testified that that is why he had purchased the pistol and placed it inside the closet. There is no evidence that appellant actually knew that the pistol

40

was inside the house, or that his brother had even purchased it. The fact that he was asleep in the room, said the room was his, and had his wallet inside the room is not enough to affirmatively link him to knowingly possessing the pistol because of the accesses and use of the room by other family members. The pistol was not in plain view (the closet door was closed and it was up high surrounded by many other items with only the back portion visible *if* the door were opened and the person opening it were to look up instead of down), appellant made no incriminating statements, he did not attempt to flee, and he made no furtive gestures or indications of consciousness of guilt. Without even delving into the question of whether appellant has a right to keep and bear the pistol under the narrow circumstances of this case pursuant to article I, section 23 or the Second Amendment, these facts do not affirmatively like him to the pistol and therefore he should be acquitted.

If the Court concludes that there are affirmative links establishing that appellant knowingly possessed the pistol, the Court should nevertheless acquit because the legislature is presumed to have passed a constitutional statute and under the constitutional-harmony canon, the Court should not construe the statute in a way that will render it unconstitutional. A conviction under the circumstances of this case would result in a violation of the constitutional rights of appellant's family members and himself to keep and bear arms under article I, section 23 and

the Second Amendment. The evidence, at best, only shows that appellant is affirmatively linked (of course, appellant does not agree that even this is the case for the reasons stated above) to the pistol knowing that his brother had placed it inside the closet of the bedroom.

If a family member has placed a pistol in the family homestead for self-defense purposes in a dangerous neighborhood and the home has been previously shot at and had rocks thrown through the window, it violates the family member's right to keep and bear arms to convict a fellow family member who is only affirmatively liked to knowing that the pistol is in the house—the chilling affect on the family member who purchased the pistol is obvious. That family member would not want to exercise this very important and fundamental right because it would cause him to risk losing another fundamental right of association with his family member who would end up in jail for his having asserted his fundamental right to keep and bear a firearm for self-protection in the home. Moreover, under the narrow circumstances of this case, even appellant has a right to keep and bear the pistol, in spite of his felon status. This is because his felony conviction is for a non-violent offense, the offense is a per se mens rea (*i.e.*, strict liability) case because it was for "statutory rape" where knowledge of the age of the victim is irrelevant, and he had just become an adult when the offense was committed. Under these extremely narrow circumstance— pistol in home, history of a need for self-defense, non-violent felony, youth

42

at the time of conviction, brother purchased the pistol for self-defense and if possessed by appellant it was only in that he knew his brother had it in the closet—appellant has a right to keep and bear the pistol under article I, section 23 of the Texas Constitution and under the Second Amendment of the United States Constitution.

Accordingly this Court should construe section 46.04(a)(1) such that the legislature did not intend for a violation to occur under the circumstances of this case and hold that there is insufficient evidence to sustain the conviction and enter a judgment of acquittal. Such an interpretation allows the Court to read the texts of the statute and constitutional provisions holistically so that the text of one is synthesized with the other, thereby respecting the intentions of the Framers and the intentions of the Legislature.

* * *

43

# Part Two – Ineffective Assistance of Counsel

A basic tenet of criminal law is that evidence of a defendant's bad character is not admissible to show that he acted in conformity therewith.[4] Even if bad-acts evidence is relevant to a non-character conformity issue, it is still inadmissible if its probative value is substantially outweighed by the danger of unfair prejudice to the defendant.[5]

In the trial of appellant's case, a litany of information showing that he was a bad person generally came into evidence, without objection, for no purpose other than to prove character conformity. Failure to object to this evidence was such an obvious professional blunder that there can be no reasonable trial strategy to justify the omission, and therefore, the

---

[4] TEX. R. EVID. 404(b); *Johnston v. State*, 145 S.W.3d 215, 219 (Tex. Crim. App. 2004) (bad character evidence is inherently prejudicial, tends to confuse the issues, and forces defendant to defend himself against charges he has not been notified would be brought against him); *Robbins v. State*, 88 S.W.3d 256, 259 (Tex. Crim. App. 2002) ("Relevant evidence of a person's bad character is generally not admissible for the purpose of showing that he acted in conformity therewith."); *Webb*, 36 S.W.3d at 181 ("[P]roof of the sexual assault against Porter served no probative function other than to show appellant as a person who commits sexual assaults in general, and therefore, was more likely to have committed the sexual assault against Baird, an inference rule 404(b) strictly forbids."); *Rankin v. State*, 974 S.W.2d 707, 718 (Tex. Crim. App. 1996); *Abnor v. State*, 871 S.W.2d 726, 738 (Tex. Crim. App. 1994); *Montgomery v. State*, 810 S.W.2d 372, 390 (Tex. Crim. App. 1991) (trial court has no discretion to admit over proper objection extraneous offense evidence that is relevant only to character conformity).

[5] TEX. R. EVID. 403; *Johnston v. State*, 145 S.W.3d at 220; *Robbins*, 88 S.W.3d at 262-263; *Mitchell v. State*, 931 S.W.2d 950, 952 (Tex. Crim. App. 1996).

ineffective assistance claim can be raised on direct appeal instead of by habeas review.[6] Moreover, the cases are legion which hold that a lawyer is ineffective in failing to object to inadmissible character conformity, bad-acts evidence, like the evidence in this case, and therefore, review by direct appeal is the efficient and procedurally correct avenue for review.[7]

---

[6] *Mata v. State*, 226 S.W.3d 425, 428-29 (Tex. Crim. App. 2007) (ineffective assistance claim proper on direct appeal when defense counsel's conduct is of a type that no reasonably competent lawyer would have engaged in for any reason); *Goodspeed v. State*, 187 S.W.3d 390, 396 (Tex. Crim. App. 2005) (Holcomb, J., dissenting) (same); *Andrews*, 159 S.W.3d at 100 (same); *Ex parte Menchaca*, 854 S.W.2d 128, 131-33 (Tex. Crim. App. 1993) (same); *Vasquez v. State*, 830 S.W.2d 948, 951 (Tex. Crim. App. 1992) (same); *see also Miles v. State*, 644 S.W.2d at 23, 25-26 (Tex. App.—El Paso 1982, no pet.) (abatement of direct appeal regarding claim of ineffective assistance for trial court to conduct hearing to further develop record regarding counsel's alleged deficiencies where strong indications counsel was deficient).

[7] *See, e.g., Roberts v. State*, 187 S.W.3d 475, 486 (Tex. Crim. App. 2006) ("We decide that appellant's trial lawyer performed deficiently under the first prong of *Strickland* for eliciting testimony from appellant at the guilt phase of his trial that appellant was already incarcerated on two convictions that were pending on appeal."); *Ex parte Menchaca*, 854 S.W.2d 128, 131-33 (Tex. Crim. App. 1998) (counsel ineffective for allowing prior drug conviction to be heard by jury during guilt-innocence phase of rape trial); *Cude v. State*, 588 S.W.2d 895, 897-98 (Tex. Crim. App. 1979) (counsel ineffective by failing to object to extraneous offenses of defendant and his relatives during guilt-innocence phase of aggravated robbery trial); *Stone v. State*, 17 S.W.3d 348, 353 (Tex. App.—Corpus Christi 2000, pet. ref'd) ("We hold that under the facts of this case, counsel's decision to elicit testimony regarding the prior murder conviction cannot be considered part of a reasonable trial strategy. We believe that where, as here, the record affirmatively demonstrates that counsel took some action in defending his client that no reasonably competent attorney could have believed constituted sound trial strategy, the defendant has shown he received ineffective assistance of counsel."); *Perrero v. State*, 990 S.W.2d 896, 899 (Tex. App.—El Paso 1999, pet. ref'd) (counsel ineffective by not preparing defendant well enough to testy so he would not open door to admission of

45

The *Strickland v. Washington* standard of review is applied to

---

his prior record in assault and resisting arrest case); *Anaya v. State*, 988 S.W.2d 823, 826 (Tex. App.—Amarillo 1999, no pet.) (counsel ineffective by asking defendant, "Have you been in trouble for anything else?" and thus opened door regarding extraneous offenses); *Brown v. State*, 974 S.W.2d 289, 293 (Tex. App.—San Antonio 1998, pet. ref'd) (counsel ineffective by allowing drug use and promiscuity to be heard by jury during guilt-innocence of murder trial); *Thomas v. State*, 923 S.W.2d 611, 613-14 (Tex. App.—Houston [1st Dist.] 1995, no pet.) ("Counsel for appellant had a duty to object to harmful, inadmissible evidence, and when she neglected that duty, appellant suffered. Although appellant applied for and proved his eligibility for probation, the trial judge assessed his punishment at 16 years of confinement. Counsel's failure to object to inadmissible evidence offenses allowed the trial court to consider allegations that appellant had threatened police officers, had stalked police officers and the prosecutor, and had solicited the murder of police officers. Clearly, the overwhelming prejudicial effect of these allegations outweighed any potential benefit of cross-examination."); *Glivens v. State*, 918 S.W.2d 30, 33-34 (Tex. App.—Houston [1st Dist.] 1996, pet. ref'd) (counsel ineffective at punishment phase where trial court assessed punishment after jury determined guilt even though evidence was offered during guilt phase of trial, because no indication trial court did not consider evidence in sentencing); *Ramirez v. State*, 873 S.W.2d 757, 763 (Tex. App.—El Paso 1994, pet. ref'd) (counsel ineffective by allowing prior murder conviction during a jury trial into evidence during guilt-innocence phase of murder trial); *Montez v. State*, 824 S.W.2d 308, 310 (Tex. App.—San Antonio 1992, no pet.) ("Although the State did not try to inject extraneous offenses, Mr. Montez's own lawyer actually and affirmatively elicited, on cross-examination of the State's witnesses, numerous highly prejudicial extraneous acts which otherwise would have been inadmissible."); *Boyington v. State*, 738 S.W.2d 704, 708 (Tex. App.—Houston [1st Dist.] 1985, no pet.) ("Although the [extraneous bad acts] evidence complained of was properly admitted during another phase of the trial, it was admitted only because counsel for appellant without any plausible reason, presented character witnesses, thus allowing the inadmissible deeds to become admissible."); *Miles v. State*, 644 S.W.2d 23, 25 (Tex. App.—El Paso 1982, no pet.) (counsel opened door for admission of defendant's arrest record); *Spriggs v. Collins*, 993 F.2d 85, 89-90 (5th Cir. 1993) (counsel ineffective for not objecting to unadjudicated extraneous offenses in PSI report); *Lyons v. McCotter*, 770 F.2d 529, 531 (5th Cir. 1985) (counsel ineffective for allowing prior convictions of burglary and drugs to be heard by jury in guilt-innocence phase of aggravated robbery trial).

ineffective assistance claims. 466 U.S. 668, 688 (1984); *Hernandez v. State*, 726 S.W.2d 53, 57 (Tex. Crim. App. 1986) (adopting the *Strickland* test for Texas criminal cases). The standard of review is a two-prong test, stated as follows:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. *Strickland*, 466 U.S. at 688.

Failure to establish one prong of the test negates a court's need to consider the other. *Id.* at 697. Trial counsel is presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. *Id.* at 689 & 690. The burden is on the defendant to overcome the presumption that, under the circumstances, the challenged action might be sound trial strategy. *Id.* at 689. Because of this, the record must affirmatively demonstrate the claim of ineffectiveness. *Thompson v. State*, 9 S.W.3d 808, 812-13 (Tex. Crim. App. 1999). Counsel's errors are judged by the totality of the representation. *Strickland*, 466 U.S. at 695-96.

When counsel is deficient in allowing inadmissible evidence into evidence the following factors are relevant to determine if the defendant

47

was prejudiced by the deficiency: (1) the weight, nature, and focus of the evidence presented to the jury; (2) the nature of the prosecutor's closing argument; and (3) the relative role the disputed conviction played in the outcome of the trial. *Ex parte Menchaca*, 854 S.W.2d 128, 133 (Tex. Crim. App. 1993) (citing *Crockett v. McCotter*, 796 F.2d 787, 793-94 (5th Cir. 1986)). Moreover, when the basis of an ineffective assistance claim is that counsel failed to object to inadmissible evidence, the defendant must show that the trial court would have committed error in overruling the objection. *Vaughn v. State*, 931 S.W.2d 564, 566 (Tex. Crim. App. 1996); *Gosch v. State*, 829 S.W.2d 775, 784 (Tex. Crim. App. 1991).

The state offered into evidence the prison records of appellant containing the laundry list of bad-acts that appellant had, according to the records, engaged in over time. The records had no relevance to any issues to be decided by the jury other than to show that because appellant was a bad person in the past he must, logically, have been a bad person on this occasion and therefore been a felon in possession of the pistol. Although this is a classic example of evidence that should not be admitted into evidence, appellant's trial counsel did not object.

What aggravated the circumstances even more is that the improperly admitted evidence makes it appear that appellant was a violent rapist when that is by no means the case. Appellant pleaded guilty to a sexual offense that, on its face, was not a violent sexual assault. According to the guilty

plea and the surrounding undisputed evidence, appellant was eighteen and the victim was a teenager between fourteen and seventeen. There is a wide range of factual possibilities that are not contained in the appellate record as to what exactly happened and as to what exactly were the circumstances, yet those factual contours were never litigated. Yet trial counsel allowed this damning evidence into evidence without objection even though it indicates that what in fact happened was the worst—violent rape. Pile on top of that the evidence of the multiple arrests, escape, masturbating in front of prison officials and use of all told forms of illegal narcotics imaginable—all of which is totally and clearly inadmissible with no objection forthcoming—and the prejudicial effect is obvious.

There is no amount of intellectualizing that could result in any legitimate trial strategy to justify not objecting to this evidence. Therefore, this ineffective assistance of counsel claim is properly raised on direct appeal, and this Court should reverse for a new trial.

# PRAYER

Accordingly, appellant, Jessie Dimas Alvarado, prays that the court reverse and render the trial court's judgment and acquit appellant, or alternatively, reverse and remand for a new trial.

Respectfully submitted,

/s/Timothy A. Hootman_____
Timothy A. Hootman
SBN 09965450
2402 Pease St
Houston, TX 77003
713.247.9548
713.583.9523 (fax)
E-mail: thootman2000@yahoo.com

ATTORNEY FOR APPELLANT, JESSIE
DIMAS ALVARADO

# CERTIFICATE OF WORD COUNT

I hereby certify that, in accordance with Rule 9.4 of the Texas Rules of Appellate Procedure, that the number of words contained in this document are 11,760 according to the computer program used to prepare this document.

Dated: March 12, 2015.

/s/Timothy A. Hootman_____
Timothy A. Hootman

# CERTIFICATE OF SERVICE

I hereby certify that, in accordance with Rule 9.5 of the Texas Rules of Appellate Procedure, I have served the forgoing document upon the following attorneys by personal mail, by commercial delivery service, or by fax:

Neil Krugh
Sarah Bruchmiller
Harris County District Attorney's Office
1201 Franklin
Houston, TX 77002

Dated: March 12, 2015.

/s/Timothy A. Hootman_____
Timothy A. Hootman